COORS AND BIRDSONG, M.D.'s et
al., Plaintiffs,

v.

TENNESSEE TEMPORARY JOINT
UNDERWRITING ASSOCIATION
et al., Defendants.

No. C–76–80.

United States District Court,
W. D. Tennessee, W. D.

July 26, 1977.

Ernest G. Kelly, Jr., Evans, Petree, Cobb & Edwards, Memphis, Tenn., for plaintiffs.

John M. Heiskell, Memphis, Tenn., C. Hayes Cooney, Chief Deputy Atty. Gen., State of Tenn., Nashville, Tenn., for defendants.

## ORDER

WELLFORD, District Judge.

Several Memphis-based medical professional associations have filed suit against Tennessee Temporary Joint Underwriting Association (hereafter TTJUA) and its Directors under 42 U.S.C. §§ 1981 and 1983 and the First and Fourteenth Amendments. TTJUA was created by Chapter 350 of the 1975 Tennessee Public Acts, *Tenn.Code Ann.* 56–4301 through 56–4315, as the exclusive agency for new medical malpractice insurance for Tennessee physicians, effective June 6, 1975. Plaintiffs assert in the complaint that pursuant to findings by the Tennessee Commissioner of Insurance that medical malpractice insurance was not available to Tennessee doctors in the voluntary or private insurance market, TTJUA was established as the sole agency for the writing of such insurance, and that when their policies expired, plaintiffs were forced to obtain coverage through that agency unless they desired to be self-insured. The complaint asserts that TTJUA has refused to write such insurance for those engaged in group practice unless the group itself purchases a separate and additional policy for twenty per cent (20%) of the premiums of all the individual doctors comprising the group or association.

Plaintiffs charge that the practice in issue is "arbitrary and capricious and not based on any increase in . . . risk . . . and is clearly excessive . . . not based on any valid claims experience whatsoever." It is, therefore, claimed that this practice constitutes a taking without compensation and without due process. A separate claim is that defendants have acted wrongfully in requiring a partnership or association to be insured under this procedure before individual partners or members can obtain policies despite a request by plaintiffs to the contrary, and that the practice constitutes "an invidious discrimination . . . on the basis of their exercise of First Amendment rights of freedom of association." Finally, plaintiffs contend that defendants have violated the statutory scheme itself in establishing the practice and procedure complained about, because it is discriminatory and establishes rates on other than an "actuarially sound basis."[1]

---

1. *Tenn.Code Ann.* § 56–4304. *Plan of operation-Content-Approval-Amendments.—*

    (2) The plan of operation shall provide for economic, fair and non-discriminatory administration and for the prompt and efficient provision of medical malpractice insurance, and shall contain other provisions including, but not limited to preliminary assessment of all members for initial expenses necessary to commence operations, establishment of necessary facilities, management of the association, assessment of members to defray losses and expenses, commission arrangements, reasonable and objective underwriting standards, acceptance and cession of reinsurance, appointment of servicing carriers or other servicing arrangements and procedures for determining amounts of insurance to be provided by the association.

. . . .

56–4305. *Policy coverage-Cancellation-Premiums-Retrospective Plan-Inspection by Commissioner.—*

    (3) The rates, rating plans, rating rules, rating classifications and territories applicable to the insurance written by the association and statistics relating thereto shall be subject to chapter 6 of title 56, giving due consideration to the past and prospective loss and expense experience for medical malpractice insurance written and to be written in this state, trends in the frequency and severity of losses, the investment income of the association, and such other information as the commissioner may require. All rates shall be on an actuarially sound basis, giving due consideration to the group retrospective rating plan and the stabilization reserve fund, and shall be calculated to be self-

Plaintiffs assert that more than $60,000 in excess premiums was charged. Plaintiffs have asserted this to be a class action under F.R.Civ.P. 23 and have moved to certify the class.

In their answer, defendants aver that since the filing of the complaint, a certificate of authority to transact business in Tennessee has been issued to a new insurance company formed to write medical malpractice insurance; but they admit the procedure challenged as to a group or partnership rate requirement as a condition precedent to writing insurance policies for individual association or partnership doctors. It is also admitted that part of this premium goes to the statutorily established "stabilization fund."

TTJUA was established as a non-profit (nor loss) quasi-public organization to make medical malpractice insurance available for protection of health care providers, to assure the public of availability of protection in case of legitimate malpractice claims at the lowest possible cost.[2] During the same time period, efforts also were being made by other state legislatures to provide such insurance in the face of escalating costs and reluctance of the private insurance industry to insure physicians for malpractice. *See Hartford Accident Indemnity v. Ingram,* 290 N.C. 457, 226 S.E.2d 498 (1976). The statute created TTJUA with its sole and exclusive powers to operate only during the period in which the State Commissioner would certify that a medical malpractice insurance crisis exists, not to exceed two years.

The Court has considered the entire record in this cause, the arguments of counsel, and the memoranda of the parties in support of their positions relative to defendants' motion to dismiss and/or for summary judgment.

State action, a state nexus, may exist in the creation and operation of TTJUA under the Tennessee law here in question. It is a statutory creation, closely intermingled with state functions, particularly the Commissioner of Insurance. The rationale of *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), indicates that 42 U.S.C. § 1983 does apply if plaintiffs can show deprivation of a constitutional right by operation of and under color of state law. *See Craft v. Memphis Light, Gas & Water Div.,* 534 F.2d 684 (6th Cir. 1976) (a property interest exists in continuation of utility services.)[3] Is there a similar property interest in expectation of obtaining malpractice insurance?

*Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), dealt with due process requirements in respect to a claimed property interest, in that instance, a job as a state university teacher. To claim an interest protected by the Constitution, he was declared to be required to show "more than a unilateral expectation . . . instead . . . a legitimate claim of entitlement . . ." *See Coe v. Bogart,* 519 F.2d 10 (6th Cir. 1975). Plaintiffs' liberty interests are not abridged since they are free to pursue the practice of medicine without insurance protection; they must, instead, show a legitimate claim of entitlement to have malpractice insurance to claim Fourteenth Amendment due process protection. *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Even a requirement imposed by a state-supported hospital that a physician must evidence malpractice insurance protection to be on the hospital staff has been held not to involve sufficient property or liberty interest within the meaning of 42 U.S.C. § 1983 or the Fourteenth Amendment due process standards,

---

supporting. The commissioner shall make available to the association the loss and expense experience of insurers previously writing medical malpractice insurance in this state.

· · ·

**2.** *See* Memorandum of CNA Insurance Companies to TTJUA Directors dated February 9, 1976, produced in response to plaintiffs' interests.

**3.** *Aff'd.* subsequent to this Order, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978).

nor to violate the doctor's civil rights. *Pollock v. Methodist Hospital*, 392 F.Supp. 393, 396 (E.D.La.1975). Transfer of a tenured teacher likewise does not involve requisite liberty or property interests. *Sullivan v. Brown*, 544 F.2d 279 (6th Cir. 1976).

Recent decisions by appellate tribunals, moreover, have indicated that 42 U.S.C. § 1983 suits should be viewed more cautiously; § 1983 is not a "catch-all statute" intended to solve myriads of problems and disputes that may well lie best in state court. *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) and *Sullivan v. Brown, supra*, at 284. The claim that the rate charge was arbitrary, capricious and involved violation of the state law should properly be presented to a state court if any cause of action whatever is stated in that claim.

Since the filing of suit, the Tennessee Department of Insurance has ordered TTJUA to close its underwriting insurance operation. Defendants argue that this may deprive the Court of jurisdiction since the jurisdictional amount of $10,000 may no longer be involved. The Court need not reach the jurisdiction question, however, since it has been found that no constitutional right has been violated.

The statute in question here was clearly designed to be of temporary assistance to plaintiffs and all the physicians of Tennessee, who were hard pressed by skyrocketing malpractice insurance costs and its limited availability. The public had an interest in a system to enable the doctors to obtain such insurance. There was, however, no property right of a magnitude sufficient to show a legitimate claim of entitlement to malpractice insurance. In that respect, the Fourteenth Amendment claim must fail. Nor was the action of defendants a deprivation of plaintiffs' First Amendment rights of association; nor did the TTJUA's action in assessing a special premium have any "chilling effect" on plaintiffs' right of association. There can be seen some legitimate, rational and reasonable basis for treating doctors in a group

on a different basis from those practicing alone insofar as insurance exposure is concerned. There was, then, no evident nor apparent discriminatory motivation in the procedure adopted. This Court is not required, therefore, to have an evidentiary hearing as to the reasonableness of the rates charged by TTJUA.

Defendants' motion for judgment is therefore granted. This ruling, of course, is not a judgment on the merits of plaintiffs' claim as to the propriety of the rate structure of TTJUA during its existence.